*NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| NICHOLAS WATSON, | : | |
| | : | Civil Action No. 15-4018 (SDW) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| STEPHEN D'ILIO, et al. | : | |
| | : | |
| Respondents. | : | |
| | : | |

**WIGENTON**, District Judge:

Presently before the Court is the petition for a writ of habeas corpus of Nicholas Watson ("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging Petitioner's state court conviction (ECF No. 1). Following an extension, the State has filed a response to the petition. (ECF No. 7-8). Petitioner did not file a reply brief. For the following reasons, this Court will deny the petition and deny Petitioner a certificate of appealability.

## I. BACKGROUND

In its opinion affirming Petitioner's conviction, the Superior Court of New Jersey – Appellate Division offered the following summary of the basic facts underlying this case:

> [Petitioner's] indictment arose out of a series of robberies that occurred in Clifton and Passaic on August 18, 2006. [Petitioner] does not contest that the robberies may have occurred, but he denies any involvement in them.
>
> According to the State's proofs at trial, [Petitioner], Roland Lamont, Kimani Taylor, and Omar Tracey were all riding in a borrowed truck in the early morning hours of August 18, 2006.

[Petitioner] allegedly stated to his companions in the vehicle that they should "get some funds."

Consequently, at approximately 2:00 a.m., Taylor, who was driving the truck at the time, pulled over on or near Lexington Avenue in Passaic.  [Petitioner], along with Lamont, then exited the truck while wearing masks and carrying guns.  They confronted two pedestrians, Antonio Alvaro and his niece.  The men stole Alvaro's phone and wallet, and then fled in the truck.

Shortly thereafter, Taylor pulled the truck up to the corner of Paulison and Howe Avenues in Passaic and Tracey and Lamont got out.  While carrying guns, Tracy and Lamont stole a wallet from another pedestrian, Victor Garcia.  They reentered the truck and drove off.

Taylor again pulled over the truck in Clifton, around a corner from where four people (Shawn Kaiser, George Montoya, Joshua Estrada, and Samantha Angelo) were standing in a residential driveway.  [Petitioner], Tracey, and Lamont got out of the truck and walked around the corner to where the four individuals were standing.  After two of the robbers pulled out guns, they then went through the pockets of the four individuals, removing their cell phones and wallets, and once again fled to the truck and drove away.

Finally, the group of robbers drove to a gas station in Passaic, located at the corner of Broadway and Van Houton Streets.  [Petitioner], Tracey, and Lamont again got out of the truck.   At this point, [Petitioner] and Lamont were carrying guns.  The robbers instructed the gas station attendant, Gurbachan Singh, to give them money and get on the floor.   After Singh refused to obey, [Petitioner] and Lamont shot him on the foot, leg, and stomach.  A bystander, Gersan Montalvo, who was leaving a night club across the street, heard the gunshots.  Montalvo then observed a dark vehicle arrive and pick up several persons who ran out of the gas station.  Montalvo went over to the gas station and found Singh lying on the floor with gunshot wounds.

Singh dies a short time later at a local hospital. Investigators thereafter recovered two shell casings and two projectiles from the office inside the gas station, and ballistics reports confirmed that the bullets had been fired from two different guns.

Phone records from the stolen cell phones showed a series of phone calls to Rakema Nelson.  Investigators spoke with Nelson, who identified Lamont, Taylor and Tracey as suspects in the robberies.

Thereafter, Taylor turned himself in.  Taylor admitted that he had taken part in the robberies with [Petitioner], Lamont, and Tracey, and that [Petitioner] had prompted the group to commit those robberies.  Taylor stated that [Petitioner] and Lamont had guns in their possession when they initially drove to Lexington Avenue in Passaic.  Taylor also stated that the borrowed truck used in the robberies belonged to Orlando Williams.  Williams subsequently admitted that he had lent the truck to [Petitioner] in the past.

At trial, the State presented numerous witnesses to establish [Petitioner]'s involvement in these robberies and the fatal shooting of Singh.  The witnesses included Taylor and Tracey, who testified for the prosecution after reaching plea agreements in which they received more lenient treatment in exchange for their cooperation.

In his trial testimony, Tracey stated that [Petitioner] had initially been driving the borrowed truck but then switched places with Taylor.  He corroborated [Petitioner]'s involvement in all four robberies.  With respect to the gas station robbery, Tracey testified that when Singh refused to get down on the floor, he observed [Petitioner] shoot Singh in the leg and Lamont shoot him in the stomach.

[Petitioner] did not testify at trial or present any competing proofs.

(Document 12 attached to ECF No. 7 at 3-6).

In regard to the decision of Petitioner not to testify and the decision not to call any witnesses, the trial court allowed counsel to conduct the following colloquy on the record:

[Counsel:]:  Okay.  [Petitioner], you understand that we've reached that point in the case now where the prosecutor is done with his witnesses and with any evidence that he wants to put before the jury.  You understand that, right?

[Petitioner]:  Yes, sir.

3

[Counsel]:   And he has now what they call rest[ed], he's finished. You understand that?

[Petitioner]:   Yes, I understand.

[Counsel]:   And now we have some decisions to make or we've made some decisions already about how we're going to proceed at this point.   Now obviously at this point in time it is now the defense's turn to do anything that we may want to do but we don't have any witnesses that we're calling.   Is that correct and you understand that?

[Petitioner]:   Yes, sir.

[Counsel]:   Okay.   Now do you also understand that . . . we're going to be placing some photographs into evidence?

[Petitioner]:   I understand.

[Counsel]:   Okay.   But other than that, that's all we're going to do on the defense.   Now you understand that you could testify in this case?

[Petitioner]:   Yes.

[Counsel]:   You could take the witness stand and testify on your own behalf.   Do you understand that?

[Petitioner]:   Yes.

[Counsel]:   You understand that I would ask you questions on what we call direct examination and then when I'm finished . . . the prosecutor . . . will cross-examine you?

[Petitioner]:   Yes.

[Counsel]:   And you understand how that works?

[Petitioner]:   Yes.

[Counsel]:   You saw how witness[es] were questioned by the prosecution, then I got up and I cross-examined them. . .

[Petitioner]:   Yes.

[Counsel]:   . . . and the same would happen with you.

[Petitioner]:   Yes.

[Counsel]:   Okay.   Now you and I have discussed whether or not you should take the witness stand and I have recommended to you that you not take the witness stand but ultimately the decision is yours.   Is that correct?

[Petitioner]:   Yes.

[Counsel]:   Okay.   And do you want to take the witness stand?

[Petitioner]:   No, I do not.

[Counsel]:   Okay.   Has anybody forced you or threatened you into deciding not to take the witness stand?

[Petitioner]:   No.

[Counsel]:   Are you doing it voluntarily and on your own behalf?

[Petitioner]:   Yes.

[Counsel]:   Okay.   And you know that you're doing as you're making that decision today, correct?

[Petitioner]:   Yes.

[Counsel]:   You're not under the influence of alcohol or any medications.   Is that correct?

[Petitioner]:   Yes.

[Petitioner also confirmed through further colloquy with his attorney that he did not wish for the trial judge to provide the jury with an instruction that they should disregard his choice not to testify.]

(Document 5 attached to ECF No. 7 at 42-45).

Because one of Petitioner's claims centers on it, this Court would also note that the trial court put certain rules into effect for the testimony of Petitioner's co-defendants who testified against him, requiring each to appear in street clothes, to not be seen by the jury while entering or exiting the secure areas of the court, and having each accompanied to the witness stand by a police officer rather than have them appear in shackles.   (Document 5 attached to ECF No. 7 at 36).   The trial court explained this decision as follows:

> I don't know whether the side bar was on the record, but . . . the prosecutor raised a concern about having [Petitioner's co-defendants who testified as witnesses] walk into the security area in the presence of the jury, and frankly, I appreciate it, that's a good direction, because even though [they're] the State's witness[es], based on the case law, there is some concern in the Appellate Division [regarding prejudice to the defendant] when [a State witness] is an associate of the defendant or supposedly an accomplice of the defendant.
>
> That's why he's not dressed in county . . . jail clothes, that's why he's dressed in street clothes, and that's why we've kept the jury from seeing [the co-defendant witnesses] coming in or out of the security room, although it seems to me it's all really mooted because an officer walks to the witness stand with him and sits right alongside him [for security purposes] while he's in the witness chair.
>
> But this is . . . probably the best to at least minimize [any prejudice] this way, so that's what happened at sidebar [for the record], and it's probably good judgment by the prosecutor to suggest that.

(*Id.*).

In his summation, defense counsel focused on the argument that Petitioner's co-defendants identified him as the fourth participant in the robberies in order to protect someone else, possibly the owner of the truck they used, Orlando Williams.   (*See* Document 6 attached to ECF No. 7 at 11-15).   In so doing, counsel argued that, to the extent these witnesses had

identified Petitioner as having joined them in robbing and shooting Singh, they had done so falsely, and their testimony could not be taken at face value given their criminal past and the deals they received from the State, even going so far as to refer to them by such names as "street hoods."   (*Id.*).   In making that argument, counsel eventually made the following comments in which he suggested that these witnesses identified Petitioner to receive the benefit of their plea deals:

> Now you see, you know, [the Assistant Prosecutor] is like the Godfather.  He gave these guys, they couldn't refuse his offer.  I mean, thank you very [much] . . . but they should be in here on their knees thanking [the prosecutor] and [his office] for sending them home with the offer that they [received] and they couldn't refuse that.
>
> What guy in his right mind, or woman, or whatever is going to say no, I'm going to take my chances and go to trial, with a confession taped, 30 years to life [off the table under the deal's terms]?   I ain't refusing that.   They're taking it, [Assistant Prosecutor], thank you very much.

(*Id.* at 15).   During summation, counsel also directly attacked the credibility of Williams, asserting that his testimony at trial was "half-baked," that Williams was either an "out and out liar" or "the poster child for the ill effects of smoking weed because his mind is shot."   (*Id.*at 21).   Counsel also attacked Williams for his reticence to testify, noting that Williams had stated that he was being "forced" to testify and didn't "want to be [at the trial]," and suggesting that this reticence impugned whatever credibility Williams had.   (*Id.* at 22).

In response to these arguments, the State made the following comments which Petitioner now challenges.   The assistant prosecutor first discussed the credibility of Williams, specifically referencing testimony by Williams that he was part of a "crew":[1]

> And [Williams], he didn't want to be here.  Of course he didn't want to be here.  We brought him here.  And he wasn't happy about being here.   Why?   Because a member of his crew had done something, had done something in his vehicle.

> And he was about as excited about being here and telling you that he lent them the vehicle as your worst nightmare.   I mean, now he's got to come in, it would be like asking you to go and say, you know, testify about something your family member did or a friend of yours did.   You think you want to do that, even though in your heart of hearts you know that [you] lent the kid that vehicle and I know when I lent it to him?

> [The prosecutor then describes how Williams couldn't remember the answers to the State's questions even after watching video of himself, but could remember answers to the questions Defense Counsel asked.]

> How many times does [Defense Counsel] have to play the video to get him to remember what was on the tape?  Zero, zero. Why? Because he was doing everything he could to protect his crew member.

---

[1]  That testimony was as follows:

> [The State]:   Now . . . are you a member of some type of crew?
> [Williams]:   No, I'm not.
> [The State]:   Were you at that point [when you loaned Petitioner the truck]?
> [Williams]:   Yes, I was.
> [The State]:   And what crew were you a part of?
> [Williams]:   The Bersachi crew.
> [The State]:   And at that time was [Petitioner] part of the crew?
> [Williams]:   I guess . . . I don't know, 'cause . . . I [knew Petitioner before joining the crew].

(Document 4 attached to ECF No. 7 at 50).   Williams did not further clarify whether or not Petitioner was a member of his crew.   (*Id.*).

8

> Wouldn't answer the questions for the State, [but] had no problem answering for his crew member.   Why is that?   Because he had a bias for testifying for one side.

(*Id.* at 30-31).   The State did not, however, assert that the two were in a "gang," however.   (*Id.*).

The assistant prosecutor also responded to counsel's assertion that he was the "Godfather" making deals that couldn't be refused:

> Did [Petitioner's co-defendants] get deals?   Yeah, they got . . . deals.   Am I happy about it?   No.   Am I the Godfather? Absolutely not.   I've been called many things.   The Godfather is (indiscernible).
>
> I appreciate the props.   I haven't climbed up the ladder yet far enough . . . to where I'm calling the shots.   But [making plea deals is] part . . . of the business, okay, and to be honest with you, from my perspective it's the ugly part of the business.
>
> There's many satisfying things being a prosecutor, and that's why . . . I stay here.   I could be doing other things.   I could be out being a colleague with [Defense Counsel] and other very fine defense attorneys, probably making more money, but I like what I do.   It's fulfilling.   It's satisfying.
>
> But like with any side, there's the bad sides to it, and the plea bargains is the part that I don't like.   It's the bad side.   It's the part that you really, you know, it eats at you because they should be getting more time, probably, probably, but it's the nature of the beast, and it's been happening since the beginning of time.
>
> It happens in cases all across the country.   Sammy the Bull was called to testify against John Gotti.   Co-defendants are now being called as we sit here to testify against O.J. Simpson.   It happens.
>
> And it had to happen in this case in some respect because of how these events took place and you heard from the witnesses, there was no identification going to be made [by anyone but the co-defendants].

(*Id.* at 34-35).   Finally, the prosecutor summed up his opposition to Defense Counsel's assertion

that the jury should discount the credibility of Petitioner's co-defendants based on their having

taken plea deals:

> When you look at the credibility of these witnesses, and
> again, can you say do I throw the baby out with the bath water,
> they're bad people, they pled guilty, they're going to jail, why
> should I believe them.
>
> I mean, if you want to do that, I can't stop you, but I think
> if you're true to your oath, I think if you're intellectually honest
> not only with yourself but with the other members of the jury when
> you go back there and deliberate, that you'll evaluate their
> testimony, that you'll see what they said and why they said it, but
> more importantly, too, when they said it.

(*Id.* at 41).

Following summations, the jury ultimately acquitted Petitioner of the top count of felony

murder, but convicted Petitioner

> of four counts of first-degree armed robbery, [in violation of N.J.
> Stat. Ann. §] 2C:15-1, three counts of second-degree possession of
> a weapon for an unlawful purpose, [in violation of N.J. Stat. Ann. §]
> 2C:39-4a, two counts of third-degree unlawful possession of a
> weapon, [in violation of N.J. Stat. Ann. §] 2C:39-5b, a single count
> of third-degree aggravated assault, [in violation of N.J. Stat. Ann. §]
> 2C:12-1b(7), and one count of second-degree conspiracy to commit
> robbery, [in violation of N.J. Stat. Ann. §§] 2C:5-2 [and] 15-1. . . .
> After the trial, the court merged the second degree weapons
> convictions and the conspiracy conviction with their related armed-
> robbery convictions for sentencing purposes, it imposed two
> consecutive seventeen-year terms for two of the robberies, plus a
> consecutive five-year term for the two third degree unlawful
> weapons offenses, which were made concurrent with one another.
> For the aggravated assault, the court sentenced [Petitioner] to a five-
> year term that was to run concurrently with the later of his two
> robbery sentences.   Finally, the court sentenced [Petitioner] to
> seventeen-year terms for both of the remaining robbery convictions,
> but ordered these to "run concurrent with the other counts."

> This brought [Petitioner's] aggregate incarceration period to thirty-nine years for all convictions combined.   By operation of law, the thirty-four-year portion of the sentence for the two robberies is subject to an eighty-five percent parole ineligibility period under the No Early Release Act ("NERA"), [N.J. Stat. Ann. §] 2C:43-7.2.

(Documents 12 attached to ECF No. 7 at 2).

Petitioner appealed his conviction and the Appellate Division affirmed his conviction on July 13, 2010.   (*Id.*).   Although they affirmed both Petitioner's conviction and sentence, the Appellate Division did remand Petitioner's matter to the sentencing court solely to clarify in the Judgment of Conviction that the NERA parole disqualifiers applied solely to the thirty four year periods of incarceration arising out of Petitioner's robbery, conspiracy, and assault convictions, and not the remaining five year concurrent term for weapons charges.[2]   (*Id.* at 12-13). Petitioner sought certification with the New Jersey Supreme Court, but such certification was denied on November 16, 2010.   (Document 13 attached to ECF No. 7).

Petitioner thereafter filed a petition for post-conviction relief, which the trial court denied on June 26, 2012.   (*See* Document 19 attached to ECF No. 7 at 1).   While most of the claims Petitioner raised in the PCR court were straightforward ineffective assistance of counsel claims, one such claim, specifically Petitioner's claim that he had an alibi witness, included the presentation of some arguably new evidence.   In support of that claim, Petitioner provided the PCR court with three certifications:   one from his father stating that he had told counsel that Petitioner's aunt could provide an alibi and that Petitioner's father had argued with counsel about

---

[2]  The Appellate Division qualified this remand as being "an administrative matter" to correct a lack of clarity in the judgment of conviction document itself, and not as a correction to the actually imposed sentence.   (*Id.*).

counsel's refusal to call witnesses, one from Petitioner asserting that he spent the evening of the

events in question at his home with his Aunt, and one from his Aunt purporting to substantiate

Petitioner's alibi claim.   (Document 17 attached to ECF No. 7 at 25-33).   In her certification,

which was dated February 29, 2012, Petitioner's Aunt stated that she and Petitioner worked in

the family restaurant until 10:00 p.m, that Petitioner arrived home (where only she and Petitioner

were staying at the time) between 11:30 and midnight, and that she believed this meant that

Petitioner could not have been present during the early morning hours of the following day to

commit the robberies in question.   (*Id.* at 27-28).

Petitioner appealed the denial of his PCR petition to the Appellate Division, which

affirmed that denial by way of an opinion issued on December 15, 2014.   As to Petitioner's

assertion that he should have received a hearing on the alibi claim, the Appellate Division

rejected that claim as meritless, making the following remarks:

> [t]he alibi now claimed by [Petitioner] did not surface until three
> years after the trial.   Tellingly, [Petitioner] never made any
> reference to an alibi on the record at trial or at the time of his
> sentencing.   After his direct appeal was exhausted, [Petitioner]
> provided a statement from his aunt contending that he had returned
> from working at the family restaurant before midnight and went to
> bed thereafter.   Even if she had testified, the aunt very likely would
> have been viewed by the jurors as a biased witness because of her
> familial relationship with [Petitioner].   Her delay in providing a
> statement to support the alibi is highly suspect.   Moreover, her
> proposed testimony would not have ruled out [Petitioner's]
> involvement in the robberies because she allegedly heard
> [Petitioner] come home around 11:30 p.m., whereas the robberies
> took place over two hours later.   Applying the highly deferential
> standard of review of a defense attorney's decision as [to] whether
> to call a witness at trial, we discern no constitutional violation in
> counsel's choice to refrain from presenting the aunt's testimony.

(Document 19 attached to ECF No. 7 at 5-6).   Petitioner petitioned the New Jersey Supreme

Court for certification, which was denied on April 28, 2015.   (Document 22 attached to ECF

No. 7).   Petitioner thereafter filed the instant habeas petition on or about June 15, 2015.   (ECF

No. 1).

## II.   DISCUSSION

### A.   Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of

habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on

the ground that he is in custody in violation of the Constitution or laws or treaties of the United

States."   A habeas petitioner has the burden of establishing his entitlement to relief for each claim

presented in his petition based upon the record that was before the state court.   *See Eley v.

Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, --- U.S. ---, ---,132 S.

Ct. 2148, 2151 (2012).   Under the statute, as amended by the Anti-Terrorism and Effective Death

Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to

the determinations of the state trial and appellate courts.   *See Renico v. Lett*, 559 U.S. 766, 772-

73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall

not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the

State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, --- U.S. ---, ---, 125 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## B.   Analysis

### 1.   Petitioner's request for an evidentiary hearing

Petitioner argues that he should be granted an evidentiary hearing on his habeas claims. 28 U.S.C. § 2254(e)(2) generally bars habeas petitioners who are challenging their state court convictions from receiving evidentiary hearings where they failed to develop the factual record underlying their claims in the state courts. That rule, however, does not apply where the petitioner "unsuccessfully sought an evidentiary hearing in the PCR court and unsuccessfully appealed from the denial of his PCR petition" and as a result did not fail to develop the record, but was denied the opportunity to do so. *Branch v. Sweeney*, 758 F.3d 226, 241 (3d Cir. 2014). "In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court."

14

*Palmer v. Hendricks*, 592 F.3d 386, 393 (3d Cir. 2010) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 468 (2007)).   Although the decision to provide a hearing is within the discretion of the court in such cases, that decision is subject to two considerations which must guide the Court's exercise of that discretion:

> First, in determining whether or not to hold an evidentiary hearing, courts should "consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro*, 550 U.S. at 474[].   In other words, courts considering the appropriateness of an evidentiary hearing should determine whether the petition presents a prima facie showing which, if proven, would enable the petitioner to prevail on the merits of the asserted claim. *See, e.g., Campbell v. Burris*, 515 F.3d 172, 184 (3d Cir. 2008); *Wells v. Petsock*, 941 F.2d 253, 259 (3d Cir. 1991); *Smith v. Freeman*, 892 F.2d 331, 338 (3d Cir. 1989).   The reasons underlying such a consideration are self-evident-given "AEDPA's acknowledged purpose of reducing delays in the execution of state and federal criminal sentences," *Schriro*, 550 U.S. at 475[] (quotation marks, citations, and brackets omitted), a court should be reluctant to convene an evidentiary hearing to explore the claims of a petitioner whose pleadings are factually insufficient to suggest any entitlement to habeas relief.   *See, e.g., Campbell*, 515 F.3d at 184 ("bald assertions and conclusory allegations do not afford a sufficient ground for an evidentiary hearing") (quoting *Mayberry v. Petsock*, 821 F.2d 179, 185 (3d Cir. 1987)); *Anderson v. Att'y Gen. of Kansas*, 425 F.3d 853, 858-59 (10th Cir. 2005) (to warrant an evidentiary hearing, a habeas petitioner's "factual allegations must be specific and particularized, not general or conclusory") (quotation marks and citation omitted).
>
> Second, "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."   *Schriro*, 550 U.S. at 474[].   That is, even if the factual allegations in the habeas petition are sufficient to make out a prima facie claim for habeas relief, a district court may decline to convene an evidentiary hearing if the factual allegations are "contravened by the existing record."   *Id.* (citation omitted); *see also Campbell*, 209 F.3d at 290.   As the Supreme Court has explained, "[i]f district courts were required to allow federal habeas applicants to develop even the most

> insubstantial factual allegations in evidentiary hearings, district courts would be forced to reopen factual disputes that were conclusively resolved in the state courts." *Schriro*, 550 U.S. at 475[].

*Palmer*, 592 F.3d at 393.

Assuming, *arguendo*, that Petitioner did not fail to develop the record in this case because he sought but was denied a hearing in the state courts, Petitioner is not entitled to an evidentiary hearing in this case. As this Court will explain, all of the claims Petitioner presents are clearly without merit based on the record before this Court and Petitioner has failed to establish a prima facie entitlement to habeas relief. As such, he is not entitled to an evidentiary hearing. *Id.* at 394.

## 2. Petitioner's claim that the Prosecution committed misconduct in its summation

Petitioner first asserts that the prosecutor committed misconduct in certain statements he made during summation about the credibility of the witnesses at trial, his satisfaction with his job and in his statements regarding Williams belonging to a "crew." The Supreme Court has held that prosecutorial misconduct is insufficient to overturn a conviction unless it 'so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Reid v. Beard*, 420 F. App'x 156, 159 (3d Cir. 2011) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Even where a prosecutor's comments are inappropriate or "deserving universal condemnation," that fact is not in and of itself sufficient to warrant habeas relief. In determining whether habeas relief is warranted based upon allegations of prosecutorial misconduct, a district court must "'examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence

against the [petitioner]' to determine if [the] prosecutorial conduct rises to a level that infects the trial with such unfairness as to make the resulting conviction a denial of due process." *Reid*, 420 F. App'x at 159 (quoting *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).

Petitioner first argues that the prosecutor committed misconduct in arguing that if the jury members were true to their oaths, they would find Petitioner's co-defendants credible. In examining this argument in context, the prosecutor in this instance responded to the argument of the defense which suggested that Petitioner's co-defendants' testimony should be discounted because they were bad men who had made deals to receive lesser sentences. The prosecutor's comments here fairly responded to these arguments, suggesting only that while the jury could disregard the testimony of the co-defendants if they so chose, to reject the testimony of multiple corroborated witnesses on the basis of their being criminals alone would be disingenuous. The prosecutor thus was responding to an argument raised by the defense and merely reminding the jury of their duty to examine the testimony presented fairly and on the basis of the trial record. The prosecutor did not suggest that the jury had to find the co-defendants credible, nor that the jury should find them credible on the basis of the prosecutor's opinions. Instead, the state argued that the corroborated testimony of the co-defendants was credible in light of both the content of the testimony they provided and when they provided it (shortly after the crime). This was entirely fair comment, especially in light of the extensive arguments by defense counsel arguing that the deals the co-defendants had made and their criminal history should lead the jury to reject their testimony. Thus, it does not appear that this comment amounts to misconduct, and it is certainly clear that it does not amount to misconduct so severe as to infect Petitioner's trial with unfairness sufficient to impugn due process. Thus, Petitioner has failed to establish his entitlement to habeas

relief on this basis.   *Reid*, 420 F. App'x at 159.

Petitioner next challenges the prosecutor's statements about the satisfaction he acquires from acting as a prosecutor rather than as a defense attorney.   An examination of the context of that statement, rather than just the brief comment Petitioner decries, reveals that this statement was made in direct response to the argument of defense counsel which likened the prosecutor to the "Godfather" making offers that could not be refused when the prosecutor extended plea deals to Petitioner's co-defendants.   In response, the prosecutor mentioned his satisfaction with being a prosecutor only as part of his argument that despite that satisfaction, even he is bothered by the reality of the necessity of plea deals.   Thus, the challenged comment did no more than respond to an argument of the defense, and in no way disparaged the defense or defense counsel in the process, instead merely addressing the defense's argument that the prosecution's witnesses couldn't be trusted because of the plea deals they received.   Thus, the comments at issue do not appear to have been improper, and even were they improper, they were certainly not so severe as to infect Petitioner's trial with unfairness.   Thus these comments are insufficient to warrant habeas relief. *Reid*, 420 F. App'x at 159.

Petitioner's argument regarding the prosecutor's statement about Williams belonging to a "crew" fairs no better.   These comments from the prosecutor, which directly addressed the reason that Williams was hesitant to testify for the State but was far less hesitant to provide testimony for the defense, responded to the lengthy argument by defense counsel that Williams' alleged lack of memory was indicative of Williams either lying or being drug addled.   In response, the prosecutor argued that Williams hesitance and testimony reflected Williams' bias in favor of his friend and crew member who had been charged with a serious crime using Williams' own car.   Thus, this

comment, too, was a fair response to the lengthy and targeted attack on Williams' credibility leveled by defense counsel.   To the extent that Petitioner suggests the prosecutor implied he was a member of a gang, that term was not used by the prosecution in summation or otherwise, and nothing in the record suggests that this argument prejudiced Petitioner.   As such, it is clear that the prosecutor's comments regarding Williams covering for his crew member certainly did not infect Petitioner's trial with unfairness, especially in light of the strong testimonial evidence showing Petitioner's guilt, and thus Petitioner has failed to show that the comment amounted to a denial of due process.   Thus, this assertion of misconduct, too, falls far short of establishing a basis for habeas relief.   *Reid*, 420 F. App'x at 159.

Underlying Petitioner's assertion that the "crew" comments were improper is Petitioner's suggestion that the testimony of Williams that he had belonged to a "crew" and that Petitioner may also have belonged to that crew should not have been admitted in the first place.   No Supreme Court decision of which this Court is aware compels this result, and relevant Supreme Court case law instead supports the opposite conclusion.   *See United States v. Abel*, 469 U.S. 45, 49-53 (a "witness' and a party's common membership in an organization, even without proof that the witness or party has personally adopted its tenants, is certainly probative of bias" and therefore admissible where not overly prejudicial).   The testimony of Williams that he belonged to a crew, and that Petitioner may also have been a member of that crew, was certainly probative of Williams' bias in favor of Petitioner.   That the prosecutor did not press on the "crew" issue as indicative of anything other than bias,[3] and nothing about the name of the crew or the testimony about it given

_____

[3] As the Appellate Division notes in its opinion (Document 12 attached to ECF No. 7 at 10), it was defense counsel, and not the State, who suggested that Williams was a gang member, and the Prosecutor was careful to avoid using the inflammatory term "gang" in referring to Williams

by Williams appeared to have been prejudicial, let alone overly prejudicial, suggests that the Appellate Division was entirely correct in concluding that the admission of this testimony was not erroneous, especially in light of counsel's failure to object to this testimony.   Given the holding in *Abel*, and the Appellate Division's express reliance thereon in finding the admission of such testimony proper, Petitioner has failed to show that the admission of this evidence amounted to an unreasonable application of Supreme Court precedent, and Petitioner is not entitled to habeas relief on this basis.

### 3.   Petitioner's jury instruction claim

Petitioner next argues that the trial court erred by not giving an identification jury instruction.   "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief."   *Duncan v. Morton*, 256 F.3d 189, 203 (3d Cir.) (quoting *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991)), *cert. denied*, 534 U.S. 919 (2001).   A state trial court's alleged error in charging a jury will only warrant habeas relief where "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."   *Id.* (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).   That a given instruction is "undesirable, erroneous, or even universally condemned" is not sufficient in and of itself to warrant habeas relief, and a court must consider any allegedly improper instruction in the context of the overall charge given to the jury to determine whether due process has been violated.   *Id.*

In this case, the Appellate Division examined the instructions given and determined that the trial court was not required under state law to *sua sponte* issue an identity instruction.   The

---

or Petitioner.

Appellate Division so held for good reason: this was not a case involving a true misidentification defense, the Defendant did not argue that his co-defendants did not know him or failed to accurately identify him.   Instead, Petitioner in this case argued that his co-defendants *lied* about who their accomplice was, rather than suggest that they did not know who Petitioner was and were mistaken in identifying him.   Petitioner was well known to his co-defendants, and several of his co-defendants identified Petitioner as the last of the robbers at issue in this case.   That the State argued that the chief issue before the jury was the identity of the fourth robber does not change this calculus – neither side questioned the *ability* of the co-defendants to identify Petitioner, only whether they were being *honest* when they did so identify him.   As the Appellate Division observed, if Petitioner's several co-defendants were found credible, that Petitioner was the fourth robber would not be in doubt.   Petitioner did not engage in a misidentification defense, and as such, no identity charge was proper under state law under these facts.   (*See* Document 12 attached to ECF No. 7 at 10-11).   Given these facts, it is clear that the trial court's "failure" to give an identity charge was not sufficiently severe to infect Petitioner's trial and render his conviction a violation of due process, and Petitioner's claim does not warrant habeas relief.   *Duncan*, 256 F.3d at 203; *see also State v. Cotto*, 182 N.J. 316, 325, 865 A.2d 660 (2005) (identification charge only necessary *sua sponte* under New Jersey law where identification is a "major . . . thrust of the defense" such as in those cases where "the State relies on a single victim-eyewitness").

### 4.   Petitioner's sentencing claims

Petitioner next challenges his sentence arguing both that his overall sentence was excessive and that his crimes did not warrant consecutive sentences under state law.   Petitioner provides

little argument in support of either assertion.   "Sentencing is generally considered a matter of state criminal procedure, which does not fall within the purview of federal habeas review."   *Vreeland v. Warren*, No. 11-5239, 2013 WL 1867043, at *17 (D.N.J. May 2, 2013); *see also Sutton v. Blackwell*, 327 F. Supp. 2d 477, 486 (D.N.J. 2004) (sentencing "is a matter of state criminal procedure and it does not involve such a denial of fundamental fairness as to fall within the purview of federal habeas corpus"); *Grecco v. O'Lone*, 661 F. Supp. 408, 415 (D.N.J. 1987).   "Federal courts are thus limited on habeas review of a petitioner's sentence to the question of whether the prisoner's sentence exceeds the relevant statutory limits."   *Reddick v. Warren*, No. , 2016 WL 29261, at *13 (D.N.J. Jan. 4, 2016) (citing *Vreeland*, 2013 WL 1867043 at *17).   Here, the sentences Petitioner received for his crimes were within the statutory limits for the relevant crimes and Petitioner does not assert otherwise.   *See generally*, N.J. Stat. Ann. §§ 2C:15-1, 2C:39-5(b), 2C:12-1(b)(7), 2C:43-6.   (*See also* Document 12 attached to ECF No. 7 at 11-12).   To the extent that Petitioner argues that his crimes did not warrant consecutive sentencing under state law, specifically *State v Yarbough*, 100 N.J. 627, 643, 498 A.2d 1239 (1985), *cert. denied*, 475 U.S. 1014 (1986), *superseded in part by* N.J. Stat. Ann. § 2C:44-5, the state courts rejected that argument as unfounded because Petitioner's crimes included multiple robberies in multiple locations against multiple witnesses, all of which weigh in favor the imposition of consecutive sentences.   (Document 12 attached to ECF No. 7 at 11-12).   The facts at issue clearly support this conclusion, and the state courts' decisions clearly were not based on an unreasonable application of the law.   As Petitioner's sentence was well within the statutory limits, and the imposition of consecutive sentences was within the discretion of the trial court under State law, Petitioner's claims regarding his sentence do not present cognizable habeas claims.   *Vreeland*, 2013 WL

1867043 at *17.

**5.   Petitioner's ineffective assistance of counsel claims**

In his remaining claims, Petitioner asserts that he received ineffective assistance of counsel prior to and during his criminal trial.   The standard which governs such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984).   To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient.   This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.
>
> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005).   A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.
>
> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93.   "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.   The petitioner must demonstrate that

"there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015). In his petition, Petitioner attempts to raise four distinct claims of ineffective assistance of counsel: that counsel failed to present Petitioner's aunt's testimony as an alibi defense, that counsel deprived Petitioner of the ability to testify on his own behalf, that counsel failed to investigate and prepare for trial with Petitioner, and that counsel failed to object to the security measures put into place during the testimony of Petitioner's co-defendants.

### a.  Petitioner's alibi claim

Petitioner first asserts that counsel was ineffective in failing to call his aunt as an alibi witness. When presented with claims that a petitioner's trial counsel was ineffective in failing to call a particular witness, courts "are 'required not simply to give [the] attorney[ ] the benefit of the doubt, but to affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as he did.'" *Branch v. Sweeney*, 758 F.3d 226, 235 (3d Cir. 2014). Likewise,

> Strickland requires that a defendant "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."   466 U.S. at 689 (internal quotation marks omitted).   If the Government "can show that counsel actually pursued an informed strategy (one decided upon after a thorough investigation of the relevant law and facts)," the effectiveness of counsel's assistance is "virtually unchallengeable." *Thomas v. Varner*, 428 F.3d 491, 500 (3d Cir. 2005).

United States v. Graves, 613 Fed. App'x 157, 159, 2015 WL 3406548, at *2 (3d Cir. May 28, 2015).   Even where a petition can clear this hurdle, he must still show that, had counsel called the alleged witness, there is a reasonable probability that the outcome of his case would have been different.   *Judge*, 119 F. Supp. 3d at 280-81.

Here, Petitioner asserts that counsel was ineffective in failing to call his aunt as an alibi witness.   Even assuming, *arguendo*, that counsel's failure to call Petitioner's aunt amounted to deficient performance, Petitioner has still failed to show that he has suffered prejudice as a result of that failure.   Even putting aside the fact that Petitioner's aunt did not come forth with a statement until several years after Petitioner's conviction and taking Petitioner and his father at face value when they claim to have raised Petitioner's aunt to counsel during the trial, Petitioner's aunt can only speak of Petitioner's whereabouts at approximately eleven thirty, some two hours before the robberies.   Thus, even if the jury would have accepted her testimony, it did not directly contradict the corroborated testimony of Petitioner's co-defendants who identified Petitioner as taking part in the robberies several hours after Petitioner's aunt had gone to bed. As such, Petitioner's aunt would not actually have provided Petitioner with an alibi of any substantive strength.   Given the fact that Petitioner's aunt's testimony would likely also have been discounted given her relationship to Petitioner, it does not appear that Petitioner's aunt's testimony would have had any effect upon the result of Petitioner's trial.   As such, Petitioner has

clearly failed to show that he suffered any prejudice as a result of the failure to call his aunt as a witness, and as a result has not established a claim of ineffective assistance.   *Strickland*, 466 U.S. at 697-98.   As Petitioner has failed to show ineffective assistance, he has likewise failed to show that the decisions of the state courts in this matter were based upon an unreasonable application of federal law or the facts at issue, and no habeas relief is therefore warranted.


**b.   Petitioner's claim that counsel prevented him from testifying**

Petitioner also claims that counsel was ineffective in advising him not to take the stand at trial.   Petitioner provides no context as to what advice counsel did give him in this regard, however.   In any event, Petitioner's current assertion directly contradicts the statements he made at trial during the colloquy regarding Petitioner's decision not to testify.   During that colloquy, which is quoted above, Petitioner directly stated that he understood that the decision of whether to testify was his, that he understood that he would be subject to cross examination if he did testify, that he had discussed whether he should testify with counsel to his satisfaction, and that he did not wish to testify on his own behalf.   (Document 5 attached to ECF No. 7 at 42-45).   Thus, Petitioner's own statements in open court contradict his current claims.   Such "[s]olemn declarations in open court carry a strong presumption of verity."   *Blackledge v. Allison*, 431 U.S. 63, 73-75 (1977).   "The subsequent presentation of conclusory allegations unsupported by specifics" which contradict those solemn statements is "subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."   *Id.*   Here, Petitioner clearly stated on the record that he had discussed whether to testify with counsel, and that he had chosen not to testify, and this Court is required to give those statements a strong presumption of verity.

Petitioner, in his answer, claims that had he been properly advised he would have testified in his own behalf.   Petitioner, in his petition, provides no real elaboration on what advice he was given, or how it prevented him from deciding to testify on his own behalf.   As such, this Court perceives nothing in the record which would overcome the strong presumption that Petitioner's statement in open court that he had no intention of testifying was accurate and true, and thus Petitioner's claim is contradicted by his own statements.   Even were this not the case, as Petitioner asserts that he would have testified that he was sleeping at the time of the crimes, a claim which is contradicted by the testimony of Petitioner's co-defendants and which the jury very likely would have found wanting, Petitioner has in any event not shown that he suffered any prejudice as a result of his not testifying.   As such, Petitioner has failed to show that the state courts unreasonably applied *Strickland* or *Blackledge*, nor has he shown that their determination was based on an unreasonable application of the facts at issue, and Petitioner is therefore not entitled to habeas relief based on this claim.

### c.  Petitioner's claim that counsel failed to prepare for trial

Petitioner also asserts that counsel was ineffective in failing to investigate and prepare for trial.   In support of this claim, Petitioner provides little information other than to assert that counsel didn't meet with him frequently, and that counsel failed to produce Petitioner's aunt as a proposed alibi witness.   In order to show prejudice in relation to a claim that counsel failed to conduct a full investigation and therefore failed to prepare fully for trial,

> a defendant basing an inadequate assistance claim on his or her counsel's failure to investigate must make "a comprehensive showing as to what the investigation would have produced.   The focus of the inquiry must be on what information would have been

27

> obtained from such an investigation and whether such information, assuming admissibility in court, would have produce a different result."

*United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (quoting *Sullivan v. Fairman*, 819 F.2d 1382, 1392 (7th Cir. 1987); *see also United States v. Lathrop*, 634 F.3d 931, 939 (7th Cir. 2011) ("[w]hen a petitioner alleges that counsel's failure to investigate resulted in ineffective assistance, the petitioner has the burden of providing the court with specific information as to what the investigation would have produced"); *United States v. Green*, 882 F.2d 999, 1002 (5th Cir. 1989) ("A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome" of Petitioner's case); *accord Untied States v. Garvin*, 270 F. App'x 141, 144 (3d Cir. 2008).

As to Prejudice, Petitioner essentially asserts that counsel's failure to investigate led to him failing to call Petitioner's aunt as an alibi witness.   As previously discussed, Petitioner has failed to show that prejudice resulted from the failure to call Petitioner's aunt because her testimony would likely not have had any effect on the outcome of Petitioner's trial.   As Petitioner presents in his petition no other prejudice which resulted from counsel's alleged failure to prepare for trial, and as neither Petitioner's own proposed testimony nor his aunt's proposed testimony would have likely had an effect on Petitioner's trial, Petitioner has failed to show prejudice, and this ineffective assistance claim, too, must fail.

**d.   Petitioner's claim that counsel was ineffective in failing to object to the security measures put into place by the trial court**

Petitioner's final claim is that counsel was ineffective in failing to object to the security

measures put into place during the testimony of Petitioner's co-defendants. As to this claim, Petitioner again fails to demonstrate that he suffered any prejudice from these security measures. As the trial court explained on the record, the choice to have the co-defendants testify with an escort rather than while shackled or in prison garb was specifically made to lessen any prejudice which may have resulted for Petitioner from having his associates testify in prison garb or while shackled. Thus, the court permitted them to testify free of such constraints and only accompanied by an officer. In any event, any negative association the jury may have had resulting from this security measure would have impacted negatively on the testimony of Petitioner's co-defendants, who were testifying *against* Petitioner at trial. Thus, any negative inference as to the criminal status of those co-defendants which resulted in the minds of the jury could only have helped, rather than hindered, Petitioner, and he clearly suffered no prejudice as a result of counsel's failure to object to this security protocol. Because Petitioner has failed to show that he suffered any prejudice, this claim also fails to esablish a cognizable claim for habeas relief, *Strickland*, 466 U.S. at 692-94, and Petitioner's petition for a writ of habeas corpus must be denied.

## III.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

Because Petitioner's habeas claims are without merit, he has failed to make a substantial showing of a denial of a constitutional right. Likewise, because jurists of reason could not disagree with this Court's conclusion that Petitioner's claims are meritless, his petition is not adequate to receive encouragement to proceed further.  This Court shall therefore deny Petitioner a certificate of appealability.

## IV. CONCLUSION

For the reasons stated above, Petitioner's petition for a writ of habeas corpus is DENIED and Petitioner is DENIED a certificate of appealability.   An appropriate order follows.

April 25, 2016                                              __*s/ Susan D. Wigenton*_____
                                                              Hon. Susan D. Wigenton,
                                                              United States District Judge